Johnson, J.
The company issuing this policy was purely mutual. By its charter: “Sec. 3. The corporation hereby created shall have the power to insure the lives of its respective members, and to make all and every insurance appertaining to, or connected with, life risks, and to grant and purchase annuities.”
“ Sec. 4. Persons who shall hereafter insure with the said corporation, and also their heirs, executors, administrators, and assigns, continuing to be insured in said corporation as hereinafter provided, shall thereby .become members thereof during the period they shall remain insured by such corporation, and no longer.”
The corporate powers were vested in a board of trustees, to be elected from among the members.
Prior to 1863, the premiums were to be invested in bonds *61 secured by mortgages on unincumbered real estate, worth twice the amount loaned; or the trustees might invest not exceeding one-half the premiums, in the public stocks of the United States, the state of Wisconsin, or of any incorporated city thereof.
There was then no authority to loan to policy-holders any part of premiums on their policies.
To remedy this, and to enable the company to loan to policyholders part of their annual premiums, in case they desired thus to borrow, instead of paying all cash, the charter was amended March 23, 1863, as follows:
“ Seo. 11. The trustees shall have power to invest a certain portion of the premiums received, not to exceed one-half thereof, in public stocks of the United States or of this state, or of any incorporated city of this state, mid the company may loam, to policy-holders in said compamy, from time to time, sums not exceeding one-hedf of the armual premiums on theim policies, upon notes to loe secured loy the policy of the person to whom the loans may loe made.”
Under this amendment the policy was issued. This power was valuable to the company, as thereby its business could be greatly increased by loaning to the insured not exceeding one-half the premium, instead of • requiring all to be paid in cash.
The applicant was given the option to .pay in this method. When asked how the premium should be paid, whether all cash' or part note, she answered that she would pay by “ cash and note,” and the contract -was made accordingly.
The sixth condition of the.policy is, “This policy shall not take effect and become binding until the cash premium shall be actually paid.” The distinction between that part of the premium payable in cash, and that part paid by note, as well as the effect of non-payment of either, is shown by this clause, as well as in the following, found in the body of the policy:
“ And the said company do hereby promise and agree to pay the said sum assured, at their office, to the said assimed, or her executors, administrators or assigns, in ninety days after due notice and proof of death of the said person whose life is *62 hereby assured (the balance of the year's premium a/nd all notes given for premñwns, if amj, being first deckbated therefrom), and in case of the death of the said assured before the death of the said person whose life is assured, the amount of the said insurance shall be payable to the heirs at law of said Stephen P. Bonner.”
These premium notes are in the nature of a permanent loan. If not paid by dividends they remain as loans payable, “ when the policy becomes due by limitation, or by the death of Stephen P. Bonner.”
All notes given for premiums remaining unpaid by dividends, as well as the balance of the year’s premium, are to be deducted from the amount due on the policy. There is no personal obligation to pay these notes. They are, as designated in the annual renewal receipts ; “ Loan notes.” The renewal receipts are themselves a contract to keep the policy binding, when the cash premium and the interest is paid, and the annual loan note is given for the future year. To determine the real character of this contract, we must look to the act of incorporation of the company, with its amendments in force when it was made, with the object sought by that amendment, as well as to the application, the policy, the notes and to the premium receipts renewing the policy from year to year.
By the express terms of the last receipt, dated April 27, 1871, the policy was made binding for its face to October 27, 1871.
Had Bonner died at any time after the policy took effect, under the 6th condition, and before default made, it is clear that the whole policy would have been payable, less all premium notes then unpaid by dividends.
When default was made October 27, 1871, the right to declare a forfeiture arose under the 2d condition of the policy. It is there provided that:
“ 2d. If the said premiums, or the interest upon a/ny note given for premiums, shall not be paid on or before the days above mentioned for the payment thereof, at the office of the company, or to agents when they produce receipts signed by the president or secretary, then, in every such case, the com *63 pany shall not be liable for the payment of the whole sum assured, and for such part only as is expressly stipulated above.” The right thus reserved arises, “ if the said premiums or the interest on any note given for premiums shall not be paid.” This excludes the idea that a right of forfeiture exists for the non-payment of the notes themselves. Forfeitures are not favored, and if the policy contains doubtful or repugnant conditions, preference will be given, other considerations being equal, to that construction which will prevent a forfeiture. If, therefore, this policy was in force for its face, down to October 27, 1871, what right of forfeiture vested in the company upon default made? The default consisted in failing to pay the cash premium, and give the premium note for the seventh year, and in failing to pay the past year’s interest, on the unpaid premium notes or “ annual loans ” remaining unpaid by dividends. This interest amounted to $22.83, and if the dividend declared that year, of $35.96, should have been applied on the interest, there would have been no default, except for the premium for the seventh year.
The forfeiture operated to relieve the company of “the whole sum assured,” but left the policy binding for, “ as many tenths of the original sum insured as there shall have been complete annual premiums paid, at the time of the default.”
These provisions are utterly inconsistent with the idea, that a failure to pay the pri/ncipal of the notes would authorize a forfeiture to any extent. The words “ said premiums,” in this clause, cannot include the “ loan notes,” for there was no personal obligation to pay them. The failure to pay the interest on these notes is made a cause of forfeiture, but a failure to pay these notes is not. ' They were loans, not to be paid except by dividends, or by deduction from the policy when due.
The application, the terms of the policy and of the premium notes, as well as the stipulation of the company on the margin of the premium receipts, considered in connection with the power to loan part of the premium to the policy-holder, leave no room to doubt the real character of this contract.
It was an agreement to pay an annual premium, part in cash, and part by note, which were to be regarded as loans payable *64 out of dividends, or out of the policy when it became due. Its legal effect was the same as if the whole premium had been paid in cash, and then the amount for which the note was given borrowed back. It is true, as a general rule, that giving a note is only a conditional payment of a debt, but if it is given and accepted as payment, it is otherwise. These premium notes, or annual loan notes, as they are called, are not, in legal effect,, notes, but rather receipts for money borrowed, with an obligation to pay interest thereon, and to allow any balance unpaid thereon by dividends to be deducted from the policy, when it became payable. They are not negotiable, nor payable at any fixed time, nor for any certain amount, nor by the maker personally, but in a special mode. They are in the nature of loans to the assured, which he was under ño personal obligation to repay, and were only to be repaid by the company itself out of dividends, or out of the policy. This is shown by the policy, where it provides for part cash and part note; in the application, where the election is made to pay in “ cash and note;” in the 6th condition, where it is provided that the policy shall take effect when the “cash premium shall be actually paid;” and finally, in the clause requiring the unpaid notes to be deducted from the amount due on the policy.
We cannot better enforce the argument in support of this conclusion, than to quote from the opinion of Mr. Justice Swayne in Insurance Co. v. Dutcher, 95 U. S. 269, a case involving the same principles, but where the policy was much more favorable to the company than here.
There the policy was issued in consideration of a sum paid, and a like payment annually for ten years, on a day named, with the right to share in the profits. On the death of the assured, the policy, less the balance of the year’s premiums and all indebtedness, was to be paid. If the premium should not be paid on the day fixed, or any note given in part payment of premium, the policy to become void. After two annual payments by the insured, the company was to issue a paid-up policy for as many tenths as there had been complete annual premiums paid in cash.
These notes were in the nature of permanent loans, payable *65 out of dividends, and at each time of payment in this mode, receipts were given, as in this case, showing payment in full for the year. After four annual payments thus made, and while there was still a balance dire on the four premium notes, Mrs. Dutcher demanded a paid-up policy, but the company refused unless she would first pay the balance due on the premium notes in cash.
The learned justice says :
“ But it is said the policy declares that the amount of the paid-up policy should be determined by the sum of the premiums ‘ paid in cash.’
“ To this there is an obvious, and, we think, a conclusive answer. The part of the annual premium, for which a note was to be given, was in substance and effect a loan of so much money by the company to the assured. It was so described in the receipt of the company for the premium, and in the contract of the parties.
“ If the money had been actually paid to the company, and the next moment loaned back, and the note then taken, there would not have been room even for a quibble upon the subject.
“ Why go through such a ceremony ? Why not go directly, as was done, to the end in view ? The intent which animated the conduct of the parties determines its character. The receipt and contract both show that the transaction was regarded by both parties as a payment of money to one and a loan back to the other, for which the note was taken. The receipt was for the full amount of the premium. _ The note and loan were mentioned by way of memorandum, as a distinct matter. The law never requires an idle thing to be done. It would clearly have been this, and nothing else, if the assured had actually handed over the money and note with one hand, and, eo mstcmti, with the other taken back the money.
“The company had the power to waive the actual production and payment of the money, and to receive a note bearing interest as the same thing. It has exercised this power, and is estopped to deny the consequence. Where a surety, by giving his note, extinguishes the liability of his co-surety, he can maintain an action against the co-surety for money paid; be *66 cause the effect is the same that would have been wrought by the actual payment of the money.”
That this was the construction placed upon this policy by the company itself is evident from the fact that, on policies subsequently issued, the provision as to the liability of the company for as many tenths as there shall have been complete annual premiums paid, was qualified by adding to that clause this limitation : “ But in order to secure such proportion of • the policy, all premium notes must lye taheh up, or the interest thereon lyepand annually in cash, on the 'date of the annual maturity of the premiiom, until the notes are canceled liy returns of the surplus, or the whole policy will lye forfeited.” Hull v. N. W. M. Life Ins. Co., 39 Wis. 397; Ohde v. The Same, 40 Iowa, 357; Symonds v. The Same, 23 Minn. 491; Little v. The Same, 7 Ins. Law Jour. 50.
If, as was held in the Hull case, that the dividend declared in 1871, of $35.96, should have been applied on the interest then due on the previous notes, there was then no default in payment of interest on premium notes, for which a forfeiture could be declared.
This case'differs from that in this respect, — there the dividends were to be applied to the principal and interest of the notes, while here the interest is to be paid ainnualljj' in cash, and the dividends are to be applied on the notes.
Holding, as we do, that the giving of these premium notes was in effect a payment of the premium, and also a loan of that amount to the policy holder, the right to have a paid-up. policy for as many tenths as were thus paid became fixed, and that no subsequent default in the payment of interest on these notes would divest this right; the question of the application of this third dividend to the interest then due, instead of upon the note, becomes immaterial, in determining how many complete annual payments were made. The interest then due, as well as the subsequently-accruing interest on these notes, if not paid, followed the notes; and the amount due thereon when the policy became payable should be deducted from the $3,000 due. on the policy.
The failure to pay the interest due October 27, 1871, on the *67 previous notes, gave to the company tbe right to declare the policy forfeited as to the intime, but it did not defeat the right of the assured to a paid-up policy for the six annual payments actually made as provided for, before such failure.
The court below so adjudged, but refused to allow any deduction for unpaid interest on the balance due on these premium notes.
The reason given is, that from the time the insured ceased to pay interest to his death, the company, under its rules and under its construction of the policy, cut him off from the benefit of dividends as to four-tenths of the policy, in part represented by these notes; and that if the company was entitled to interest, he would be equally entitled to dividends on these four-tenths, which would exceed the interest.
These notes stipulated for the payment of interest annually on the premium notes, or the policy should be forfeited. The policy provides that if it be not paid on or before the days named, the company shall be liable only for as many tenths as there were complete annual payments. This liability was, as we have found, for six annual payments, out of which must be deducted all notes given for premiums unpaid by dividends. This is the whole extent of its liability after forfeiture. The complete annual payments save only as many tenths of the policy. The contract was one of mutual covenents. In consideration of the payments of the annual premiums in cash and notes, and the annual payment of interest in cash on the notes, the company agree to keep the party insured, and to pay an equitable share of the profits in dividends from time to time. The payment of this interest is a vital part of this contract; its non-payment forfeits the policy, and but for the clause limiting the forfeiture, default in such payment would forfeit the whole policy.
Prompt payment of interest is also essential to the successful prosecution of the business, and to enable the company to make and declare dividends. The assured has agreed that if there is a failure to pay this interest, the policy shall be forfeited, except as to the tenths paid for.
It would be inequitable to allow the assured • to remain in *68 default for interest due, and yet participate in the dividends declared after the policy is forfeited, which are fruits of prompt payments by other policy holders. By the very nature of the contract, the annual payment of interest was a condition precedent, to entitle the policy holder to future dividends.
We hold, therefore, that there were six complete annual payments of premiums made prior to October 27, 1871, and that the failure to pay further premiums, or the interest annually due on the balance of the notes remaining unpaid after the application of the first three dividends, forfeited said policy, except as to six-tenths thereof, and all right to future dividends thereon. We hold, further, that the unpaid interest on these notes, computed according to their terms, became part of the amount due on the notes, to be deducted from the amount found due on the policy.
As the court below erred in not allowing interest on tbe balance due on these unpaid premium notes, tbe judgment is reversed, and tbe cause is remanded for proceedings according to the foregoing opinion.